**ALASKA AIRLINES, et al., Plaintiffs,**

v.

**Richard AUSTIN, et al., Defendants.**

**Civ. A. No. 90–2879.**

United States District Court,
District of Columbia.

Aug. 12, 1992.

G. Dean Booth, L. Dale Owens, Booth, Wade and Campbell, Atlanta, Ga., for plaintiffs.

Theodore C. Hirt, Raymond M. Larizza, Patricia M. Russotto, U.S. Dept. of Justice,

Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

SPORKIN, District Judge.

### INTRODUCTION

Plaintiffs in this case are airlines that provide domestic air transportation services to United States government personnel. The defendants are the General Services Administration (GSA), which audits the government's air transportation bills and the United States of America. The case arises out of a dispute over the legality of the post-payment audits of airline transportation bills that the General Services Administration conducts. The plaintiffs contend that as a result of these audits, the government is recouping alleged overcharges from them in violation of the law. The General Services Administration maintains that the audits are conducted in accordance with applicable legal standards and that the claims for overcharges are justified. Plaintiffs are seeking an injunction as well as return of the funds they claim have been illegally taken from them.

Plaintiffs originally raised their dispute before the Comptroller General as they are legally entitled to do. *See* 31 U.S.C. § 3726(g)(1); 41 C.F.R. § 101–41.701. The Comptroller General issued an opinion on September 10, 1990 in which he stated that

> [i]f GSA seeks to apply a fare other than that shown on the ticket, it must first establish that the other fare was requested by the government or that the government was contractually entitled to that fare.

Decision of the Comptroller General, In re Alaska Airlines, Inc. *et al.*, 4 (September 10, 1990). GAO found that GSA had the legal authority to offset overcharges against current transportation bills. However, GSA could not issue a notice of overcharge unless it could show the traveler had asked for another price or was entitled to another price under a contract. At the request of the General Services Administration, the Comptroller General reviewed his earlier decision and issued another opin-

ion on September 23, 1991, confirming his original position. In between the first and the second opinions from the Comptroller General plaintiffs filed suit in this court seeking injunctive relief from GSA's current post-payment audit procedures and a return of the funds they claim have been assessed against them unlawfully.

Plaintiffs have included fourteen counts in their complaint, ten of which are requests for return of alleged overcharges taken from each of the plaintiff airlines. The other four seek

(1) an injunction requiring GSA to abide by the Comptroller General's decisions;

(2) an injunction prohibiting GSA from continuing to violate the Administrative Procedure Act with its current audit practices which allegedly have resulted in duplicative assessments for overcharges, assessments against the wrong airline and assessments for tickets bought by government employees for personal use;

(3) an injunction requiring GSA to implement procedures for providing an explanation and an opportunity for protest when it does deduct overcharges from its current transportation bills; and

(4) a preliminary injunction prohibiting offsets for overcharges during the pendency of the case.

The parties entered into a stipulation that the Court ordered into effect on May 15, 1991. The parties agreed to dismiss count three, the claim regarding procedures for explaining deductions of overcharges. The defendants also agreed to conduct pre- and post-payment audits in accordance with the Comptroller General's decision until the Court resolved the case. This stipulation gave the plaintiffs comfort during the pendency of the case, therefore, they were willing to defer a motion for a preliminary injunction. The Court is now left to resolve counts one and two, both of which request a permanent injunction, and the ten counts for monies plaintiffs claim have been improperly withheld.

### II. JURISDICTION

The Court construes this case as raising a question about the propriety of the gov-

ernment's post-payment transportation audit procedures for airlines. The plaintiffs seek an injunction to stop what they claim are the unauthorized practices now in use and an order returning funds that have been taken from them as a result of these practices. As such, this case presents a straightforward federal question: is the government auditing its airline transportation bills in accordance with applicable laws and regulations? Nevertheless, this Court's jurisdiction to hear this matter has been a subject of dispute between the parties. The government filed a motion to transfer the case to the Claims Court or, in the alternative, to dismiss the case for lack of jurisdiction. The government argues three points. First, the government claims that because the claims for return of funds made in counts five through fourteen of the complaint total well in excess of ten thousand dollars, jurisdiction lies in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1), and not in the District Court under the Little Tucker Act, 28 U.S.C. § 1346(a)(2). Second, the government argues that because all of the claims plaintiffs raise are founded upon contracts, exclusive jurisdiction lies in the Claims Court under the Tucker Act. Specifically, the government argues that the source of the rights that are at issue in this case are the city-pair contracts and Scheduled Airlines Ticket Office (SATO) contracts that the plaintiffs have with the government. Third, the government argues that to the extent the plaintiffs' claims are grounded in the Administrative Procedure Act (APA), there is no subject matter jurisdiction because the APA cannot be an independent basis for jurisdiction. Contrary to what the government argues, this Court does have jurisdiction over this action under the federal question statute, 28 U.S.C. § 1331, and the Little Tucker Act.

█ The main thrust of the government's jurisdictional challenge is aimed at the contractual nature of plaintiffs' claims. The Tucker Act grants jurisdiction to the United States Claims Court over "any claim against the United States ... for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Little Tucker Act grants concurrent jurisdiction to the United States District Courts over "any ... civil action or claim against the United States, not exceeding $10,000 in amount...." 28 U.S.C. § 1346(a)(2). In counts five through fourteen the plaintiffs are seeking the return of approximately $100 million, clearly an amount in excess of $10,000, for overcharges they claim were illegally taken from them. However, that amount represents the accumulation of disputes over alleged overcharges on thousands of individual tickets. The plaintiffs' claims are based on their contracts with the defendants to provide air travel for individual government travelers, i.e. the tickets they sold. Each contested overcharge is based on a single ticket and is for less than $10,000. Therefore, under the Little Tucker Act, jurisdiction properly lies with this Court and not the United States Claims Court. The same conclusion has already been reached in another case concerning claims for wrongful offsets for unused tickets. See *American Airlines, Inc., et al v. Austin*, 778 F.Supp. 72 (D.D.C.1991). For purposes of analyzing jurisdiction this case is no different. See also *United States v. Louisville & Nashville R. Co.*, 221 F.2d 698, 701–702 (6th Cir.1955); *Jones Motor Co., Inc. v. Teledyne, Inc.*, 690 F.Supp. 310 (D.Del.1988). As the court noted in *Jones*, different evidence will be needed to decide each claim for each individual ticket. Hence, each claim is considered separately for purposes of determining jurisdiction, and the Little Tucker Act, granting jurisdiction to this Court, applies.

█ In counts one and two the plaintiffs are seeking to enforce rights that stem from the federal statutes governing GSA's transportation audit system, 31 U.S.C. § 3726, and from the Administrative Procedure Act, 5 U.S.C. § 701, et seq. The government insists that this Court lacks jurisdiction over these claims because they are contractual in nature and therefore must be heard by the Claims Court under the Tucker Act. It claims the rights at issue stem from the city pair contracts and the SATO contract running between the gov-

ernment and the airlines. This Court has jurisdiction over these counts on two grounds. First, this Court retains the equitable powers it needs to resolve questions presented by counts five through fourteen, contract-based as they may be. The Court must have at least the same equitable powers that the Claims Court would have were it to have jurisdiction, and the Claims Court has authority to "grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief." 28 U.S.C. § 1491(a)(3). Count one asks this Court to use its equitable powers to remedy the underlying cause of the seizure of funds that the plaintiffs ask to have returned in counts five through fourteen. Therefore, given that the Court has jurisdiction over the claims for damages under the Tucker Act, it must also have jurisdiction over the equitable claims so that it may provide complete relief to the parties.

■ Second, the claims raised in counts one and two are not primarily contractual in nature and therefore fall outside the ambit of the Tucker Act. *See Ingersoll–Rand Co. v. United States*, 780 F.2d 74 (D.C.Cir.1985); *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir.1982). The dispute is over the government's methodology for determining overcharges—primarily on controlled capacity fares—not the awarding of specific contracts or payment under them. Unlike Ingersoll–Rand, the plaintiffs are not frustrated bidders. Their complaint cannot be resolved by reference to the terms of any contract or any law about contract bidding. Like Megapulse, which concerned the Trade Secrets Act, plaintiffs are pointing to a statute that creates legal obligations regardless of whether the plaintiffs have bid on a contract, formed a contract, or been terminated from a contract. The airlines are subject to audit because they have billed the government for services. They are audited whether or not those services were provided under a contract. Counts one and two address the proper standards and methodology to be used in the audits when determining whether the airlines have overcharged the government. This Court must look primarily to the governing statutes and cases to resolve this dispute. Although the government has pointed to the city-pairs contracts it has made with the airlines to substantiate its position as to what the standards should be, the Court determines jurisdiction based on the allegations of the complaint, not the defenses raised.

As our court of appeals has said, "A court will not find that a particular claim is one contractually based merely because resolution of that claim requires some reference to a contract." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 (D.C.Cir.1985). To the extent that the plaintiffs' claims are related to the individual contracts that each of the tickets represents, contract issues are still not at the heart of the dispute. This suit is not one for specific performance of ticket contracts as defendants characterize it. Therefore, this Court does have jurisdiction over the claims raised in counts one and two of the complaint because they are not fundamentally contract claims.

Also telling is the contrast with the facts in *Eagle–Picher Industries v. U.S.*, 901 F.2d 1530 (10th Cir.1990). At its core, *Eagle–Picher* was about competition between private companies to get a contract for government business. In this case all the private companies have the same interest in the outcome. The plaintiffs are not scrambling to get business or even advantageous contract terms from the government nor are they parties to a single contract with the government. They are complaining about procedures currently in use that affect all of them similarly because they all bill the government for transportation services, and they all make services available in the same way. They are seeking changes in those procedures to bring them in accordance with the law. Accordingly, the plaintiffs' claims are not essentially contract claims, and they are properly the subject of this Court's jurisdiction.

■ The government has raised an additional objection to this Court's jurisdiction over count two which raises a claim under the Administrative Procedure Act. Al-

though the APA is not itself a basis for subject matter jurisdiction, it does provide a waiver of sovereign immunity for this claim. The federal question statute, 28 U.S.C. § 1331, gives this Court subject matter jurisdiction over the claim because its central question is one of federal law: what procedures are required under the federal statute governing post-payment audits of transportation bills. *See Robbins v. Reagan,* 780 F.2d 37 (D.C.Cir.1985) (District court has jurisdiction under APA and federal question statute over dispute between homeless shelter operator and federal government over decision to close shelter). *See also Sharon v. United States,* 802 F.2d 1467 (D.C.Cir.1986) (District court has jurisdiction over appeal from Board of Indian Affairs under APA and federal question statute.)

## III. SUMMARY JUDGMENT

Plaintiffs have filed two motions, one for summary judgment on count one, seeking an injunction enforcing the decisions of the Comptroller General, and one for summary judgment on count two, seeking an injunction preventing further violations of the Administrative Procedure Act. The defendants have filed a cross-motion for summary judgment on count one. As noted above, the parties have agreed to dismiss count three. Count four, the request for a preliminary injunction, is now moot because the Court is prepared to give a final ruling on the claims for a permanent injunction. In order to understand the transactions that are at issue and the positions of the parties, the Court held three days of hearings. Based on the testimony presented and the declarations submitted by the parties, the Court believes that it now has the requisite understanding to decide the motion for summary judgment on count one. The Court finds that on count one there is no genuine issues of material fact in dispute. Therefore, summary judgment is appropriate at this time. *See Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A. *Facts*

#### 1. Airline Pricing

Airline fares for government travelers fall into two general categories: city-pair contract fares and controlled capacity fares. The former are set by formal agreement between the airlines and the government, and they apply only to specified routes or "city pairs." The latter are fares available to the general public, and as their name implies, they shift based on supply and demand. In fact, prices for airline tickets change constantly. They may change by the week, by the day or by the hour. The fares offered are divided into different categories, each of which has certain requirements which a traveler must meet in order to be eligible to receive that fare. For example, Y class fares—also known as "coach" fares—have no restrictions whatsoever. You can choose any date of departure and any length of stay, and you can purchase your ticket months in advance or five minutes before the plane pushes back from the gate. M class or H class fares may include restrictions like a Saturday-night stayover, a minimum advance purchase time or departures before 5:00 p.m. Not all fares are available on all flights at all times. As the advertisements for airline fares say, they are "subject to limited availability."

Using sophisticated computer programs and technical expertise, the airlines adjust the number of seats available in a fare class for a particular flight based on how many seats have been sold already, how many days remain before departure, and a variety of other factors that the airlines believe will bear on demand for seats at various fares. *See e.g.,* Declaration of Oscar Fernandez, ¶ 3.[1] When any passenger, including a government traveler, wishes to

---

1. In his declaration, Mr. Fernandez, who is the managing director of application development at Pan Am, stated, "Pan Am's willingness to sell a ticket for a specific flight in a specific booking code (fare category) was continuously subject to change, and that willingness routinely changed for any of a variety of reasons." He went on to list reasons that include the number of tickets that potentially could be sold, the number of cancellations made, unexpectedly high or low booking rates, and the effect of competition from other carriers on demand.

purchase a ticket, the vendor[2] checks the availability of seats at different prices. Vendors, for the most part, use computer reservations systems that allow them to see how many seats are available in different fare classes. The vendor and the passenger can then have an exchange about available seats, the passenger can make a selection, and the vendor can make a reservation for the passenger. The ticket can then be purchased immediately or some time later. The availability of seats at particular prices may vary between the time the passenger makes a reservation and the time a ticket is actually purchased.

The airlines do not maintain a record showing what seats were available in all fare classes at the time a passenger's ticket was purchased. *See e.g.*, Declaration of W.H. Crown, ¶ 2 (American Airlines); Declaration of Keith A. Substad, ¶ 2 (Northwest Airlines). Several airlines presented declarations stating that they do take "snapshots" of seat availability once a day, but they do not reflect all the changes that occur during the previous twenty-four hours. *See e.g.*, Declaration of James Prince ¶¶ 2–3 (Delta Airlines). The government has presented no evidence to show that its employees maintain any record of the fares they request when they make reservations. The only records that remain after the transaction are the tickets themselves and the government travel requests or Diner's Club receipts used in payment.

### 2. Government Air Transportation Payment System

When government employees need to travel for work reasons, they usually make individual flight plans. They pay for their airline tickets with a government travel request (GTR) or with a Diners' Club card issued to them by their employing agency. *See* 41 C.F.R. § 101–41.203–1. The airline then presents a bill to the government, and in accordance with the statute, it is paid immediately, even though a prepayment audit has not been done.[3] However, the General Services Administration may audit airline transportation bills after they have been paid and travel has been completed as the statute allows. *See* 31 U.S.C. § 3726(g)(2); 31 U.S.C. § 3523. These "postpayment audits" are the subject of the dispute in this case.

### 3. Postpayment Audits

The General Services Administration hires outside contractors to audit its airline transportation bills. They are provided with copies of tickets used by government travelers. They also get a copy of the traveler's GTR.[4] The auditors also have access to tariffs from the Passenger Interline Pricing Prorate System (PIPPS) and Airline Traffic Publishing Company (ATPCO) both of which give a historical record of the prices the airlines used for particular flights. *See* Declaration of David K. Gersmehl (Delta Airlines); Declaration of Anne L. Scott (GSA). The airlines use these tariffs to reconcile bills among themselves. Neither PIPPS nor ATPCO provide any information on whether seats were actually available at any given time at the prices which are listed.

These are essentially desk audits. At no times do the auditors visit the airlines to examine any of their books or records.

---

**2.** Government travelers may purchase tickets from a number of vendors including commercial ticket offices that serve the government under a contract, private travel agents, or the airlines themselves.

**3.** Before enactment of the current statute, the government paid its transportation bills only *after* a prepayment audit had been conducted. *See United States v. New York, New Haven and Hartford Railroad Company*, 355 U.S. 253, 255–256, 78 S.Ct. 212, 214, 2 L.Ed.2d 247 (1957). The statute was changed "in direct response to a demand of the railroads for legislation relieving them of the inordinate delays in payment of their bills attributable to the pre-audit proce-

dure, which tied up substantial amounts of accounts receivable and contributed to the financial difficulties which confronted the railroads during the depression years." *Id*, at 257, 78 S.Ct. at 215.

**4.** Originally, the government did not provide a copy of the GTR when it issued the notice of overcharge. *See* Transcript of October 11, 1991 Hearing, 68. However, the parties have since agreed that whenever the government issues a notice of overcharge it will also provide the airline with a copy of the GTR, if one was used. *See* Notice of Filing of Joint Proposed Order (November 4, 1991).

The auditors simply compare the price on the used ticket to the prices listed in PIPPS or ATPCO. If they find listed in PIPPS a lower fare (that is not a penalty fare) than appears on the ticket, and if the information they glean from the ticket indicates that the government traveler met all the requirements for that fare, the auditors issue a notice of overcharge to the airlines. *See* Declaration of Anne L. Scott, ¶ 8. The burden then shifts to the airline. If the airline fails either to prove that the charge was correct or to return the amount of the overcharge within a specified number of days, the government offsets the amount of the overcharge against the next bill it receives from that airline.

## B. *Legal Analysis of Count One*

■ Although the government is clearly authorized to audit its transportation bills after payment, it must do so in accordance with the terms of the contract for air travel—whether it be a city-pair contract for hundreds of flights or a bargain made by an employee for a single flight.[5] The government conducts its audits based on two assumptions: (1) that all fares listed in published airline tariffs were actually available at the time tickets were purchased for government travelers and (2) that the government is entitled to receive the lowest fare available. The airlines contend that the government has no legal basis for making these assumptions. Furthermore, they claim these assumptions conflict with the actual agreement that was made when the tickets in question were purchased. Therefore, the airlines argue that the notices of overcharge are being issued illegally and erroneously. They claim they are owed millions of dollars in overcharges that have been taken from them improperly. The Comptroller General agrees with the airlines. He has concluded that the government has no authority to insist on a lower fare when it cannot show that seats were actually available at the lower fare and that the government traveler actually requested or otherwise was entitled to the lower fare. This Court concurs with the Comptroller General.

In order to test the Comptroller General's conclusions, the Court approached this dispute from a different angle. Whereas the Comptroller General started by considering the second assumption about the government's right to the lowest fare, the Court began by looking at the first assumption: how does the government know it did not get the lowest fare available? This question boils down to a decision on the burden of proof.

It is important initially to examine the government's basic legal contention. The government concedes that it would be a simple matter to enter into a written contract with the airlines to provide transportation for its travelers in all instances. However, it has chosen to do so only for travel between certain cities. These agreements are known as "city-pair contracts," and their terms are clear. For example, Airline A may have a city-pair contract for flights between New York City and Chicago guaranteeing government travelers who fly that route a round-trip fare of $200. Because the terms are clear, no dispute has arisen about tickets government travelers have purchased under city-pair arrangements.

What is at issue in this case is air travel provided to governmental employees that is governed by no specific written contract. Either the government employee is flying between two cities that are not subject to any city-pair contracts or the employee is flying on an airline that does not have a contract with the government for travel between the two selected cities. Because of its privileged status as the airlines' largest customer, the government takes the position that even though it has no written contract with the airlines that controls the matters at issue in this case, by custom and usage its travelers are entitled to most-favored treatment: it must receive the lowest priced ticket the airline is willing to issue to any traveler. The court simply

---

**5.** This case does not raise issues about the auditing of tickets purchased under city-pair contracts. Because the terms of such contracts are explicit, audits are straightforward, and disputes can easily be resolved at the audit stage before the government takes any money.

cannot accept the government's contention as a general proposition.

Certainly the government is entitled to accept all the benefits that the airlines are willing to extend to its "best customer." The airlines have regularly offered special rates to government employees. These are generally referred to as "government rates" and provide the government traveler with a number of material concessions not available to the ordinary traveler. The government-rate traveler may be entitled to an unrestricted fare at the most advantageous rate without having to stay over a Saturday night to obtain a so-called "bargain fare" or the government rate traveler might not be assessed a penalty for cancellation of a government-rate ticket. However in the absence of a clearly established and applicable government rate or an explicit contract between the government and the airlines—options which allow easy monitoring for compliance—the government may not shift the burden to the airlines in effect to prove the government traveler was not treated as a "best customer" should be treated.

This Court does not understand why the government has not contracted with the airlines to cover all of its travel needs. The witnesses on both sides conceded that such a contract could certainly be negotiated. Indeed, a contract can be written which essentially would avoid all but a minimal amount of post-audit review.[6] If the government chooses to decline this option and instead enter the marketplace for tickets as would any other customer, they cannot then insist on special treatment.

The audit procedures currently in use provide the government with no basis in fact for the conclusion that a lower fare than that shown on the ticket was actually available. The auditors have no information on seat availability at the time of ticketing. All they have are the PIPPS and ATPCO tariffs. PIPPS and ATPCO are historical records that indicate what fares were available for a flight from the time seats first went on sale to the time of departure. In order to prove that the government did not get the lowest price, the General Services Administration must show not only that seats were offered at some time at a lower price but also that they were actually available at the time of ticketing. Testimony from the government's own witnesses indicates that the auditors do not have direct information about seat availability. *See* Declaration of Anne L. Scott, ¶ 10.[7] Instead, they make assumptions based on the prices they find in the tariffs, effectively shifting the burden of proof to the airlines to show that seats were not available at lower fares.

Although it argues to the contrary, the government has no basis in law for assuming that seats were available at particular fares and shifting the burden to the airlines to prove otherwise. The government relies on the Supreme Court's decision in *United States v. New York, New Haven and Hartford Railroad Company*, 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957), and argues that the airlines bear the burden of proving that they charged the correct fare. That case involved a dispute over government transportation costs. It held that the burden of proof lies with the party that has peculiar knowledge of dispositive information. The Comptroller General determined that *New York, New Haven and Hartford Railroad Company* has only limited application to the case before this Court. The Court agrees with the Comptroller General. In *New York, New Haven and Hartford Railroad Company*, the government specifically requested rail cars of certain dimensions, and only the railroad knew whether those cars were available. The railroads had a clear opportunity to satisfy or reject a particular gov-

6. It was suggested at the hearing that the airlines charge the government a specific rate for each air mile flown. An auditor would then only have to verify that the fare charged corresponds correctly with the distance traveled, a simple mathematical calculation requiring only information appearing on the ticket.

7. Ms. Scott states that, "[T]he only characteristic not within the auditor's ability to determine is whether or not seats were available at that fare."

ernment request and to build a record at the time shipment was arranged. If the government can now show that it requested specific fares that it failed to receive from the airlines, then in keeping with the earlier case, the burden is on the airlines to prove that the lower fares were not available. However, if the government cannot prove that it made a specific request, the *New York, New Haven and Hartford Railroad Company* decision does not apply.

In an administrative decision issued in November of 1991, GSA points to a regulation, 41 C.F.R. § 101–41.603–3(b), as further legal authority for its position. The regulation states that where a transportation provider pursues a claim against the government, "Clear and detailed documentation by the claimant is essential to the claim settlement; bare assertions or conclusions are not acceptable." This regulation does not mean that the government may issue notices of overcharge on the basis of "bare assertions or conclusions." GSA's administrative decision focuses on the wrong phase of the audit process. The airlines do not dispute their responsibility to provide a documentary basis for their claims of wrongful offsets, but as the Comptroller General has correctly determined, the airlines do not assume this responsibility until the government has itself assembled an adequate basis for issuing the notice of overcharge. The government is acting without legal authority when it shifts the burden of proof to the airlines as a result of inferences made from a published tariff and nothing more.

The government's regulation governing post-payment audits requires that

> For the purpose of determining whether a claim exists, GSA will consider (i) The document ordering the services furnished to determine the contractual basis upon which the rights of the Government and the carrier are based; (ii) the pertinent tariffs, special or reduced rate quotations, contracts, or agreements, to determine the proper charge for the services rendered; (iii) Decisions of the courts, regulatory bodies, and the Comptroller General affecting the rates, fares and charges; and (iv) Information furnished by transportation officers, travelers, or agencies.

41 C.F.R. § 101–41.502. The auditor must consider all this information. Currently, auditors are looking at tariffs, but they are not "pertinent" because they do not show information about seat availability. There has been no evidence presented to show that the auditors seek information about what the traveler personally requested other than what is shown on the GTR. And although the regulation directs the auditor to look at the documents requesting travel services to "determine the contractual basis" of the rights of the parties, the government is not considering each ticket purchase as a separate transaction that may give rise to a separate contract.

The statute allows the government to issue a notice of overcharge and take an offset when "an amount paid on the bill ... was greater than the rate allowed...." 31 U.S.C. § 3726(b). The government may not conclude, using its current audit procedures, that a bill actually "was greater than the rate allowed." It must revise its audit procedures to conform with the applicable law and the regulations as set forth in the decision of the Comptroller General.

Given that the government may not assume that a lower fare was actually available for purchase at the time of ticketing, the second question—whether the government is entitled to the lowest fare—diminishes in significance. The government cannot claim that it was entitled to a fare that was not actually available. But if the government can prove that a lower fare was actually available, then the question of whether the government is entitled to that lower fare arises. Where tickets have been purchased for a city-pair route, the government has a right to the price it bargained for in the city-pair contract, not a right to the lowest fare applicable. However, the terms of the city-pair contracts do not govern tickets purchased at controlled capacity fares. For the controlled-capacity fare

tickets, each transaction,[8] gives rise to a separate contract with its own terms. The government argues that the airlines should be charged with knowledge of government air travel regulations and that consequently, a request for the lowest applicable fare should automatically become part of the ticket contract regardless of what the individual traveler may say. The Comptroller General rejected this argument and concluded that

> these [city-pair] contracts and arrangements do not entitle the government to pay less for air transportation than the specific fares it has contracted for, where applicable, or such other fares as it actually requests and qualifies for.

Decision of Comptroller General, In re Alaska Airlines, Inc., et al, 13 (September 10, 1990). The government has failed to persuade this Court that the Comptroller General was in error. The plaintiffs cannot be expected to disregard the statements of legitimate government travelers in favor of a set of regulations where those regulations state that government personnel have some measure of discretion. *See* 41 C.F.R. § 301–3.4(b).[9] There is no blanket contractual right to the lowest fare.

Now that airline fares are no longer regulated, the airlines are not required to file a tariff of fares for domestic flights and issue all tickets in accordance with that tariff. The statute authorizing the government to recoup overcharges states only that it may recover charges "greater than the rate allowed under a lawful tariff ... or an equivalent arrangement." 31 U.S.C. § 3726(b). The government is not challenging the lawfulness of the fares charged by the airlines. *See* Memorandum of Points and Authorities in Support of Defendants'

Cross–Motion for Partial Summary Judgment, 18. Therefore, the statute does not give the government any entitlement to the lowest fare. It is obligated to pay the "rate allowed" under the "arrangement" that applies to the individual ticket.

■ Nor does the government have any common law right to the lowest fare. Such rights have been given to the government under circumstances where carriers are required to place their tariffs on file. *See Imperial Van Lines International, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir. 1987) (Rates filed with Military Traffic Management Command and kept in effect for six months); *Baggett Transportation Company v. United States,* 670 F.2d 1011, 1012, 229 Ct.Cl. 428 (1982) (Special rate schedule for shipment of U.S. goods filed with ICC); *Southern Pacific Transportation Co. v. United States,* 596 F.2d 461, 219 Ct.Cl. 540 (1979) (rates for shipment of U.S. goods filed with ICC). Fares in these cases vary according to factors like the route traveled, but not according to supply and demand as measured on an almost hourly basis. In the aftermath of airline deregulation, there is no equivalent system for air fares. Airlines cannot be expected to substitute their judgment for that of the government traveler in a market that changes continuously. The precedent which the government cites cannot be extended to create a common law right to the lowest fare for air travel.

In the absence of a statute or an overarching contract giving the government a right to the lowest applicable fare, the circumstances of each ticket purchase transaction establish the rights of the parties. As the Comptroller General said, "the government's rights here are the same as

---

**8.** As the government correctly states, the ticket itself is not the contract. It is evidence of a contract. *See In re Air Disaster Near Cove Neck, N.Y. et al.,* 774 F.Supp. 732, 734 (E.D.N.Y.1991). However, the totality of the circumstances which resulted in the issuance of a ticket does create a contract between the airline and the government to provide air transportation to a specific government employee over a specified route at a designated price.

**9.** This regulation states as follows:

Use of special lower fares (i) throughfares, special fares, commutations fares, excursion fares and reduced-rate round-trip fares shall be used for official travel when it can be determined before the start of the trip that this type of service is practical and economical to the Government. Round-trip tickets for special lower fares which are restricted or have specific eligibility requirements shall be secured only when, on the basis of the journey as planned, it is reasonably anticipated that these tickets will be used.

those of any member of the public who does business with an air carrier." Decision of the Comptroller General, In re Alaska Airlines, Inc., *et al.*, 15 (September 10, 1990). Therefore, in those cases where the government is able to show that a lower fare was available, it may not automatically conclude that it is entitled to the lower fare nor may it assume that the traveler asked for the lower fare. The government is entitled to receive what it bargained to pay for the individual ticket. It must revise any postpayment audit procedures which do not comport with the Comptroller General's decision.

The government is still legally permitted to conduct a post-payment audit. Nothing in this opinion should deter the government from vigilantly seeking to get the lowest price possible for air travel for its employees. Like many customers faced with the complex and constantly changing array of airline ticket prices, the government is concerned that it not pay more than necessary for air transportation. Although there has been absolutely no evidence presented that the airlines are engaging in fraud or otherwise deceptive trade practices, the government has every reason to want to avoid the consequences of mistakes and confusion.

During the hearings held in this case, the Court heard compelling testimony from a government witness, Mr. Harvey Rosenthal, the Deputy Director of Passenger Traffic of the Military Traffic Management Command, a jointly staffed organization which provides traffic management services to all Department of Defense agencies and organizations. He testified that his operation contracts with commercial travel offices to provide travel agency services to the military. Solicitations for commercial travel office contracts include a requirement that the contractor be able to audit travel arrangements prior to travel. For example, Mr. Rosenthal testified that the commercial travel offices he supervises make use of computer software that constantly checks for available seats at lower prices between the time a reservation is made and the time a ticket is issued. *See* Declaration of Harvey A. Rosenthal, ¶¶ 6–7 (April 20, 1992). Transportation bills for

military personnel are still paid before an audit is conducted, but the military has instituted measures to ensure that the government is getting the best price possible for the tickets it purchases. His testimony suggests that the government is capable of meeting its objective—confirmation that it is getting the best price—without using measures that unfairly burden the airlines. The military travel management service is entirely consistent with the opinion of this Court and with the law that governs the government's transportation payment system. It may provide at least one model that other government agencies can follow.

This Court has jurisdiction to enforce the Comptroller General's decision on multiple grounds, as set forth above. The Court has been asked to consider whether the current procedures used for post-payment audits of airline transportation bills conform with the requirements of the governing statute, 31 U.S.C. § 3726, and with the individual contracts that the tickets in dispute represent. The Court has found that the current procedures for post-payment audits of airline transportation bills are not authorized by law and therefore must be altered. The Court reached this conclusion after conducting its own independent review. Nonetheless, the conclusion is identical to that reached by the Comptroller General. Therefore, in conjunction with this opinion, the Court will enter an injunction requiring the government to conduct its audits of airline transportation bills in compliance with the Comptroller General's 1990 and 1991 decisions. Although the government protests that it is not bound by the Comptroller General's decision, there is no doubt that it is bound by a decision of this Court.

### C. *Administrative Procedure Act Claim*

The plaintiffs have alleged that the government is engaging in several illegal practices as part of its recoupment of overcharges: (1) the government is claiming overcharges on tickets for which it has sought and received a full refund; (2) the government is claiming it should have re-

ceived a coach fare for tickets which were issued at business class and first class fares; and (3) the government is offsetting overcharges against airline bills after the airlines have already returned the claimed amount to the government. The parties have largely resolved the dispute over the second set of circumstances, and the government has made the following representation: "[I]t is not GSA's audit policy to substitute coach fares for business or first class fares, or to substitute for a ticketed coach fare a lower coach fare which carried a penalty.... To the extent that GSA auditors may have made such substitutions, they were made in error and the overcharges will be refunded to the carrier." Defendants' Objections to Plaintiffs' Proposed Order, 1.

In light of these statements and the decision that has been rendered on count one, it is the Court's belief that the matters remaining under the APA are incidental and can be resolved by agreement between the parties. If the Court is mistaken and the parties are unable to settle the dispute raised in count two, they are to submit papers identifying with great specificity issues which have been settled and issues which the Court must decide.

### IV. CLAIMS FOR RETURN OF ALLEGED OVERCHARGES [10]

The plaintiffs seek the return of overcharges that have been offset against subsequent transportation bills. The overcharges have been determined using the audit procedures which this Court has found to be impermissible. Some of the overcharges have also been offset from subsequent transportation bills allegedly in violation of the APA as claimed in count two of the complaint. Although the monetary claims are not the subject of a motion for summary judgment, the government has represented to the Court that, as a general matter, it does not have access to information about the availability of fares at the time the tickets in dispute were purchased. The Court, as part of the in-

junctive relief, will now order the return of all monies held improperly with the exception of offsets for which the government may have information with respect to particular transactions that proves government travelers did request lower fares, seats were available at those fares, yet tickets were issued at higher fares. In such instances, the matter shall be taken up by the administrative process that handles such disputes.

### CONCLUSION

In accordance with the foregoing opinion, the Court will grant summary judgment in favor of the plaintiffs on count one. An injunction will be issued requiring the government to comply with the opinion of the Comptroller General when conducting future post-payment audits of transportation bills. The Court will dismiss counts three and four. The Court will retain jurisdiction in the event that there should be any dispute over implementation of the Court's order.

---

**10.** The plaintiffs have styled them as claims for "damages" in their complaint. However, they are not seeking compensation for harm done. They simply wish to have the funds returned that have been improperly taken from them, no more and no less.