ALASKA AIRLINES, INC., American Airlines, Inc., Continental Airlines Corporation, Delta Air Lines, Inc., Eastern Airlines, Inc., Northwest Airlines, Inc., Pan American World Airways, Inc., Trans World Airlines, Inc., United Airlines, USAir, Inc., Plaintiffs/Cross–Appellants,

v.

Roger W. JOHNSON, Administrator, General Services Administration, General Services Administration and United States of America, Defendants–Appellants.

Nos. 93–1028, 93–1117, 93–1125 and 93–1161.

United States Court of Appeals, Federal Circuit.

Oct. 26, 1993.

---

L. Dale Owens, Booth, Wade & Campbell, Atlanta, GA, argued, for plaintiffs/cross-appellants. With him on the brief, were Dean Booth and Scott A. Wharton.

Robert M. Loeb, Atty., Dept. of Justice, of Wash., DC, argued, for defendants-appellants. With him on the brief, were Stuart E. Schiffer, Acting Asst. Atty. Gen., J. Ramey Johnson, U.S. Atty. and William Kanter, Atty.

Before MAYER, MICHEL and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

The Administrator of the General Services Administration and the United States bring this consolidated appeal of the judgment of the United States District Court for the District of Columbia in favor of the party airlines, holding that the government's post-payment audits of airline transportation bills are not authorized by law and ordering the return of all money held by the government because of the improper audits. 801 F.Supp. 760 (D.D.C.1992). We affirm in-part, reverse in-part, and remand.

## Background

The dispute in this case focuses on one of the two ways by which the government arranges and pays for its employees' air travel. The government may enter into a contract with an airline to provide air travel at a fixed rate between two points, an arrangement called a "city-pair" contract. These are not pertinent to this appeal. It also arranges for air travel on routes not covered by city-pair contracts on an individual basis through employee purchase of tickets subject to what are termed "controlled-capacity" fares. These tickets are central to the case.

Before deregulation of air travel, airlines like other common carriers were required to publish tariffs setting the rates at which

transportation services would be provided and were legally bound to abide by those tariffs. *See* 49 U.S.C.App. § 1373(b)(1) (1982); *Aloha Airlines, Inc. v. Civil Aeronautics Board,* 598 F.2d 250, 259 (D.C.Cir. 1979). They had to charge the same fare for "like and contemporaneous services under substantially similar circumstances and conditions." *Id.* at 263 (citations omitted). As a result of deregulation, airlines now can readily adjust the prices for their services to meet changing market conditions. *See First Pennsylvania Bank, N.A. v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1119–21 (3rd Cir. 1984). Under the present system, they are free to charge a number of different fares for the same service. Although they are not required to, the airlines publish a list of these applicable fares[1] in what are inaccurately referred to as "tariff schedules".[2] Which of the applicable fares is charged on a particular ticket may be determined by the airlines in accordance with market forces; to respond to a changing market the airlines may limit the number of tickets available at a particular applicable fare. The airline designates a number of "available seats" to be sold at each applicable fare for a given service and this number fluctuates on an hour-by-hour, or sometimes a minute-by-minute, basis. In short, a customer's opportunity to secure a particular fare is governed by the number of seats at each applicable fare available when the ticket is purchased.

When faced with arranging air travel between points not covered by a city-pair contract, government employees must purchase controlled-capacity tickets. Their authority to make such purchases is limited, however, by the Federal Travel Regulations. *See* 41 C.F.R. Part 301 (1992). Initially, employees have some discretion in determining travel requirements. *See id.* § 301–3.4(b). For example, they may decide the date and time to fly, how far in advance a ticket should be purchased, and the likelihood that they might have to modify travel plans after reservation and ticketing. Once the service has been chosen the employees' discretion ends. The regulations require the purchase of the lowest cost ticket that satisfies the desired travel conditions.[3]

So that employees might travel without undue delay, the law permits the government to pay for air travel through employee ticket purchases, but to audit these contracts later to insure compliance with the travel regulations. *See* 31 U.S.C. § 3726 (1988). If, after audit, the government believes it paid too much for particular services, it may declare an overcharge and deduct the amount from a subsequent bill from the airline.[4]

In auditing payments for controlled-capacity fares, the General Services Administration (GSA) initially assumes that the government is entitled to pay the lowest applicable fare for any particular service. It then examines the travel request forms and determines the service for which the employee traveler qualified. After isolating the service provided,

---

1. For the sake of clarity, we use the term "applicable fare" to mean any one of a number of fares that may apply to a particular service, the service being defined by class, route, time and other restrictions.

2. We agree with the district court that this freedom to charge a range of fares for a given service exists for both domestic and international flights. Because the feature relevant to this appeal is the ability of the airlines to designate multiple applicable fares for a particular service, the two will be treated together.

3. The applicable regulation states:

   Except as provided in part 301–15, subpart B [describing city-pair arrangements], when common carriers furnish the same method of travel at different fares between the same points for the same types of accommodations, the lowest cost service shall be used unless use of a higher cost service is administratively determined to be more advantageous to the Government.

   41 C.F.R. § 301–3.4(c).

4. The relevant section provides:

   Not later than 3 years (excluding time of war) after the time a [transportation] bill is paid, the Government may deduct from an amount subsequently due a carrier ... an amount paid on the bill that was greater than the rate allowed under—
   (1) a lawful tariff on file with the Interstate Commerce Commission, the Secretary of Transportation with respect to foreign air transportation (as defined in the Federal Aviation Act of 1958), ... or
   (2) sections 10721–10724 of title 49 or an equivalent arrangement or an exemption.

   31 U.S.C. § 3726(b).

GSA then examines the published fare information to determine the range of applicable fares charged by the airline used.[5] At that point, the lowest applicable fare is determined and it is assumed that at the time of purchase there was a seat available at that fare. Finally, GSA compares the fare actually paid as shown on the ticket and if it is higher than the lowest applicable fare, an overcharge is declared. It then falls to the airline to challenge the overcharge and to prove its entitlement to the higher fare.

Pursuant to this audit procedure, GSA has withheld from these airlines as declared overcharges an aggregate amount in excess of $100 million. Because the airlines objected to the assumptions GSA applies in its audits and the resulting burden on the airlines to prove these assumptions incorrect, they asked the Comptroller General to review GSA's audit procedures.

The Comptroller General addressed GSA's authority to declare overcharges under 31 U.S.C. § 3726, and determined that GSA's initial assumption that the government was entitled to the lowest applicable fare was unfounded. There was no authority that *per se* entitled the government to receive the lowest applicable fare. Section 3726(b) only provides for "recovery of payments 'greater than the rate allowed' under an applicable tariff or equivalent arrangement; it does not state that this must be the lowest rate . . . ." *In re Alaska Airlines, Inc.,* No. B–231659, slip op. at 12 (Comp.Gen. Sept. 10, 1990). The Comptroller General also rejected GSA's argument that the limitations on an employee's authority by the Federal Travel Regulations require the airline to sell a government employee a ticket at the lowest applicable fare.

> While [the regulations] give direction to the government traveler and travel office and seek to have travel arranged at the lowest cost to the government consistent with the circumstances of the travel being performed, they do not constitute a basis in GSA's audit to reduce otherwise proper

carrier billings to the lowest rate that could have applied.

*In re Alaska Airlines, Inc.,* No. B–231659.4, slip op. at 10–11 (Comp.Gen. Sept. 23, 1991).

GSA argued that *United States v. New York, New Haven & Hartford R.R. Co.,* 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957), squarely placed the burden on the carrier to prove the correctness of its transportation bills. The agency asserted that it may declare an overcharge based on a ticket written at a higher applicable fare unless the airline could certify that there were no available seats at any lower applicable fare. The Comptroller General explained, however, that in *New York, New Haven* the government had made a specific request for rail cars of a certain dimension, which would have entitled the government, pursuant to a special wartime measure, to pay a lower rate if they were available. *Id.* at 256 n. 5, 78 S.Ct. at 214 n. 5. But modern air travel, which is no longer subject to mandatory tariffs and a one-service, one-price structure, is fundamentally different from the situations of the railroads in *New York, New Haven* and the provision there implicated.

The airlines then brought suit in the district court, seeking review of GSA's audit procedures under the Administrative Procedure Act, 5 U.S.C. § 702 (1988), and requesting an injunction to compel GSA to comply with the Comptroller General's decisions. In the alternative, the airlines brought multiple claims based on the contracts inherent in the individual tickets pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (1988). The district court agreed with the Comptroller General that GSA's audit procedure was impermissible. The court reiterated that GSA's assumption that there were available seats for all listed applicable fares was inconsistent with the reality of competitive airline pricing and agreed with the Comptroller General that the government was not entitled to the lowest applicable fare independent of seat availability.

The court pointed out that the *New York, New Haven* case was based largely on the

---

**5.** GSA uses the Airline Tariff Publishing Company (ATPCO), which publishes the Official Passenger Tariff listing domestic fares, and the Passenger Interline Pricing/Prorate System (PIPPS), a computerized database with information similar to ATPCO's.

rule that where evidence required to prove a fact is particularly within the knowledge and competence of one of the parties, fairness requires that that party bear the burden of coming forward. In the different situation presented by this case, where it was uncontested that the airlines do not maintain records showing what seats were available at the time a passenger purchased a ticket,[6] the rule of *New York, New Haven* does not apply.

The court did recognize, on the other hand, that the government has a legitimate interest in not paying more than necessary, but this did not entitle it to the lowest applicable fare. The government is capable of meeting its objective of confirming it has received the best price without resorting to procedures unduly burdensome on the airlines. It therefore concluded that GSA must establish that the government traveler requested a lower applicable fare, there was an available seat at that fare, and tickets were issued at a higher fare, before it may declare an overcharge and withhold funds. The court ordered the government to comply with the Comptroller General's decisions and to return funds withheld under the illegal audit procedures.

In a subsequent order the court awarded post-judgment interest to the airlines, explaining that it was acting to afford complete relief. In the alternative the court held the government's withholding of the disputed funds was a taking and interest was a proper component of the just compensation due the airlines. This appeal by the government followed.

### Discussion

### I.

We agree with the district court that the assumptions applied by GSA in its post-payment audits of airline transportation services provided through controlled-capacity fares have no basis. Neither the case law cited by the government nor the Federal Travel Regulations support the contention that the government is *per se* entitled to the lowest applicable fare. If the government wants special treatment from the airlines for its employees' travel, it can bargain for it in the first instance, as it has, for example, in the city-pair contracts. Because the government has chosen to secure travel services by purchasing controlled-capacity fares, it acts as any other purchaser of airline services and is subject to fluctuations in fares based on seat availability. In this situation the fare is determined by the agreement made between the purchaser and the airline at the time the ticket is purchased. The government is entitled only to the benefit of this bargain and GSA may not attempt to secure a better bargain through its audit procedures. It is improper for GSA to place the burden on the airlines to prove at audit that there were no available seats at any lower listed applicable fares to establish their entitlement to the ticketed fare.

GSA asserts it is entitled to assume the existence of available seats in part because the Federal Travel Regulations limit the authority of government travelers to contract for travel services and compel them to secure the lowest applicable fare. These regulations, however, provide guidance to the traveler and the ticketing agent to seek the most economical fare that meets the desired travel plans; they are not directed at the airlines.

" '[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations....' *Parsons v. United States,* 670 F.2d 164, 166 [229 Ct.Cl. 335] (1982) (citing *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15 [47 S.Ct. 1, 6, 71 L.Ed. 131] (1926))." *Haley v. Department of the Treasury,* 977 F.2d 553, 558 (Fed.Cir. 1992). And this presumption stands unless there is "irrefragable proof to the contrary." *Torncello v. United States,* 681 F.2d 756, 770, 231 Ct.Cl. 20 (1982). While the application of this presumption usually runs in favor of the government, it is equally applicable and appropriately applied in the airlines' favor in this case. The government employs sophisticated means of providing travel services for its employees. In many cases it employs highly skilled travel agents, either federal

---

6. The airlines take "snapshots" of seat availability once a day, but these do not account for all the changes that may have taken place in the previous twenty-four hour period.

employees themselves or workers under contract, to make the actual ticket purchases for the employee traveler. These agents use computer systems that constantly update seat availability and provide the agents up to the minute detailed information necessary to ascertain the lowest applicable fares for available seats at the moment of purchase. It must be presumed that these employees act in good faith to meet the regulatory goal of securing the lowest cost travel service.

This presumption of regularity attaches throughout the process which results in the issued ticket. *See Chemical Found.*, 272 U.S. at 14, 47 S.Ct. at 6 ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.") It must therefore be presumed that the employee traveler made the proper request for the most economical travel service. This request was then processed by the government's ticket agents to secure the lowest applicable fare for the desired service for which there was an available seat at the time of purchase. Thus, in its audit, GSA must presume that all parties have acted in good faith and within their authority, and if a higher applicable fare is manifested by the ticket, it must be presumed that at the time of purchase there were in fact no seats available at the lower listed applicable fares. *See Lopez v. A.C. & S., Inc.*, 858 F.2d 712, 717 (Fed.Cir.1988) (acting in good faith, government officials could not have knowingly exposed their own employees to undue asbestos hazards and so contractor could not establish breach of contract by nondisclosure of superior knowledge without rebutting this presumption).

This presumption will be conclusive in most cases. There likely will be instances, however, where GSA has some evidence inconsistent with the presumption at the time of audit, for example, that in fact a seat was available at a lower applicable fare. In such a case it may declare an overcharge and the ultimate burden of persuasion on the issue of seat availability will at that time be on the airline to present evidence sufficient to overcome that produced by the government. But if GSA cannot come up with evidence to rebut the presumption, the funds belong to the airlines and may not be withheld as overcharges.

GSA again relies on *New York, New Haven* as supporting its application of the assumption of seat availability. While that case does stand for the proposition that the ultimate burden is on the contractor to establish its entitlement to funds under a contract for transportation services, it addressed a unique situation existing between the railroads and the government in a time of war. In addition, the case does not directly address the more specific issue of what the government was entitled to assume at the time of audit. That the airlines may not be able to use their "snapshots" to prove conclusively that seats were unavailable in bringing a claim against the government for payment of an individual ticket, does not entitle GSA to assume at the time of audit that such seats were available and deprive the airline of money already earned for services already provided.

Placing the burden as GSA suggests would also contradict the realities of the controlled-capacity fare market and frustrate the reasonable expectations of the airlines for their record keeping responsibilities. The airlines do not maintain records on seat availability for all applicable fares at the moment a government employee purchases a ticket and it would be exceedingly difficult to do so. Given that the government was aware of the complexity of the market for airline services and chose to enter that market without requiring that such records be kept in the first instance, as presumably is within its power, it may not impose such a requirement retroactively through unsupported assumptions in its post-payment audit procedures.

## II.

■ As part of its order compelling GSA to revise its audit procedures to comply with the Comptroller General's decisions, the district court directed the return of all funds withheld by the government because of its illegal audits. GSA challenges the court's authority to order such relief, arguing that the "return" of money ordered by the court

was in fact an award of "money damages." The government says a district court may not award money incident to an injunction where the underlying right to the money arises by contract. In the most pertinent of the cases the government relies on for this proposition, however, the parties asked the district court to compel the government to perform its contractual obligations. *See Wabash Valley Power Assoc. v. Rural Electrification Administration*, 903 F.2d 445, 452 (7th Cir.1990) (claim seeking declaratory judgment under the APA was properly before the district court but claim seeking specific performance of contract was not); *Price v. United States. General Services Administration*, 894 F.2d 323, 324 (9th Cir.1990) (seeking to compel GSA to accept a contract bid and transfer property); *Coggeshall Development Corp. v. Diamond*, 884 F.2d 1, 5 (1st Cir.1989) (suit brought to compel Navy to upgrade sewer capacity pursuant to a lease, no APA claims raised); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C.Cir.1986) (seeking declaration of a valid contract and to prevent breach caused by transfer to a standby reserve position). The relief granted by the district court in our case was not specific performance or even based primarily on contractual obligations; it was based on the statute authorizing post-payment audits, 31 U.S.C. § 3726(b). The court also declared that because GSA holds funds withheld illegally, funds rightfully belonging to the airlines, to provide complete relief, and based on its conclusion that under the statute the government had no right to the withheld money, that money had to be returned.

Thus the airlines received money to which they were entitled under the statute, not "money damages." As the Supreme Court explained in *Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988), the "fact that a judicial remedy may require one party to pay money to another is not sufficient reason to characterize the relief as 'money damages.'" Unlike in *Bowen*, the statute here does not mandate the payment of money, it authorizes the government to withhold payment of money due on contracts. But in both cases the statutes establish legal entitlement to money. And it is the airlines that are entitled to it;

the district court's order that these funds be paid over to their rightful owner is in no way an order for the payment of "money damages."

The remainder of the cases cited by GSA to support its position are further afield from this one because the underlying contract claims in this case were properly before the district court. The primary concern of the line of authority presented by GSA was to prevent a party bringing a claim "under the APA" in district court and seeking an injunction, from forcing the government to pay money incident to a contract, and thereby avoid the exclusive jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (1988). *See Eagle–Picher Industries, Inc. v. United States*, 901 F.2d 1530, 1532 (10th Cir.1990) ("'A party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory, or mandatory relief where the thrust of the suit is to obtain money from the United States.'" (citations omitted)); *Southeast Kansas Community Action Program, Inc. v. Secretary of Agriculture*, 967 F.2d 1452, 1455 (10th Cir.1992); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 893 n. 3 (D.C.Cir.1985) (cases exceeded $10,000; exclusive jurisdiction lay in Claims Court). In those cases the district courts had no authority to decide the underlying contract claims. In this case, the district court had concurrent jurisdiction with the Court of Federal Claims over the contracts.

### III.

■ The district court awarded the airlines post-judgment interest incident to its order that the government return monies unlawfully withheld. The court cited the government's "recalcitrance" by failing to comply with its orders in a timely fashion as supporting an equitable award of interest. In the court's view, failing to award interest would allow the government to continue its delays, thereby shifting a substantial portion of the award from the winning to the losing party. The court refused to allow this "intolerable result." We do not condone the ef-

forts of the government to delay compliance with the district court's orders, but the award of post-judgment interest was not within the district court's authority.

 Interest may not be recovered against the government in the absence of an explicit waiver of sovereign immunity for that purpose. *FDL Technologies, Inc. v. United States,* 967 F.2d 1578, 1581 (Fed.Cir. 1992). District courts have authority to award interest on money judgments under 28 U.S.C. § 1961 (1988), but this cannot be read as authorizing interest awards against the United States. *See Thompson v. Kennickell,* 797 F.2d 1015, 1017 (D.C.Cir.1986). Nor may a waiver of immunity from interest be extruded from the Contract Disputes Act, 41 U.S.C. § 601, *et seq.* (1988 & Supp. III 1991). As explained above, the award in this case was not in the form of money damages pursuant to the individual ticket contracts, it was an order to return funds illegally withheld pursuant to an improper interpretation of the audit statute issued under the district court's authority to provide complete relief under the APA. The Contract Disputes Act was never invoked, and its procedural requirements were never satisfied by the airlines in this case.

Finally, the district court's conclusion that the government's withholding of the disputed funds constituted a Fifth Amendment taking, cannot support the interest award. Although the district court was correct that GSA did not properly exercise its statutory audit authority, its actions were taken in apparent good faith in the government's proprietary capacity, not in its sovereign capacity, and therefore did not constitute a taking. *See Sun Oil Co. v. United States,* 572 F.2d 786, 818, 215 Ct.Cl. 716 (1978). Besides, we are talking about the withholding of money here and the Supreme Court has said that because money is fungible there cannot be a taking under the Fifth Amendment in a situation like this. *United States v. Sperry Corp.,* 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989). The government's delay in complying with the order to return the funds cannot itself form the basis of a takings claim, either. The award of post-judgment interest must therefore be reversed.

## IV.

GSA says there remain factual disputes over individual claims not directly related to the audit practices at issue which the district court failed to address. On remand the court may conduct such further proceedings as may be advisable to resolve any factual issues the government can demonstrate are remaining, if any.

### Conclusion

Accordingly, the judgment of the district court is affirmed in-part and reversed in-part, and the case is remanded for further proceedings consistent with this opinion.

## COSTS

The airlines shall have their costs.

*AFFIRMED IN-PART, REVERSED IN-PART, AND REMANDED.*