UNITED STATES of America, Plaintiff,

v.

AMERICAN TRADING COMPANY OF SAN FRANCISCO, Defendant.

No. 32731.

United States District Court
N. D. California, S. D.

Feb. 9, 1956.

Lloyd H. Burke, U. S. Atty., Keith R. Ferguson, Sp. Asst. to Atty. Gen., Reed M. Williams, Attorney, Dept. of Justice, San Francisco, Cal., for plaintiff.

Willard G. Gilson, Lillick, Geary, Olson, Adams & Charles, San Francisco, Cal., for defendant.

HAMLIN, District Judge.

In this action, the United States seeks to recover as overcharges certain moneys which it paid to the defendant for the carriage of certain cargo. The sole disputed issue in the case concerns the payment of $39,706.63, the amount of the full freight for the carriage of cargo from San Francisco to Samoa, which was received by the defendant and which the plaintiff contends was an overcharge.

The parties entered into a written stipulation of facts. Other brief evidence was offered which was not contradicted. The stipulated facts and the offered evidence establish as follows: The United States Navy, hereinafter called the shipper, and the defendant American Trading Corporation of San Francisco, hereinafter called the defendant, entered into a contract for the carriage of certain cargo upon the steamship Marmex from San Francisco to the resident officer of the shipper in charge at Pago Pago, Samoa, for a definite sum of money, to-wit, $39,706.63. This contract consisted of bills of lading issued by the defendant, and bills of lading and public vouchers issued by the plaintiff. The cargo was loaded on board the Marmex between the dates of December 2, 1941, and December 11, 1941, at San Francisco, following which the defendant, being the owner and operator of the Marmex, was ready, willing and able to commence the voyage to Samoa. Upon completion of the loading, authorized representatives of the shipper directed the Marmex to stand by pending further orders. On or about December 29, 1941, an authorized representative of the Navy ordered the S.S. Marmex to proceed to Encinal Terminal, Alameda, California, and to discharge the cargo on board. It has been stipulated that the action of the Navy in ordering the ship to discharge the cargo at Alameda rather than per-

mitting the voyage to Samoa, was taken because of the speed of the Marmex, and that pursuant to said order the Marmex did proceed to Alameda, where it agreed to and did discharge and deliver the cargo free of lien to a representative of the United States Navy in consideration for the accomplishment of the bills of lading. The written stipulation further provides that "it was contemplated by American Trading Company and the representatives of the United States Navy that accomplishment of the bills of lading would entitle American Trading Company to the agreed freight for the subject cargo from San Francisco to Pago Pago, Samoa." When the cargo was discharged to the Navy at Alameda, a Navy officer signed the "Consignee's Certificate of Delivery" on the government bill of lading, and noted "Cargo discharged and bill of lading accomplished at Alameda instead of original point of destination because of orders of U. S. Navy, Twelfth Naval District." The discharge of the cargo at Alameda was completed on January 9, 1942, and public vouchers covering payment of the agreed freight were prepared, and payment under them was received in full by the defendant on February 6, 1942. The stipulation further shows that the Marmex ultimately loaded cargo pursuant to orders received from the United States Navy consigned to Suva, Fiji, and on February 16, 1942, the Marmex sailed for Suva, Fiji, with said cargo. It is also stipulated that if the Marmex had departed from San Francisco on December 11, 1941, she could have accomplished a trip to Samoa and returned by February 16, 1942, barring any interruption of voyage by acts of war, acts of God, or other unusual causes.

Six years later, on February 10, 1948, the United States demanded return of the full freight as an overpayment, and this demand was refused by the defendant. The United States then filed the complaint in the present action on April 22, 1953.

The plaintiff contends that it is entitled to recover back the freight payment made to the defendant, because it contends that the payment of the full freight was improper and unlawful for the following reasons: First, because the cargo was not delivered to the resident officer in charge at Samoa, which is set forth in the bills of lading as the destination, but was delivered to the United States Navy at Alameda, California, in accordance with Navy orders; Second, because of provisions in United States bills of lading which differ from those in the defendant's bills of lading; and, Third, because of the provisions of Title 31 U.S.C.A. § 529, which provides in part that—

" * * * in all cases of contracts for the performance of any service * * * for the use of the United States, payment shall not exceed the value of the service rendered * *."

The government relies in part upon the case of Alcoa S.S. Co. v. United States, 1949, 338 U.S. 421, 70 S.Ct. 190, 192, 94 L.Ed. 225. In that case the Court construed a contract for the carriage of cargo whose pertinent provisions were identical in language with those involved here. The facts there showed that cargo was shipped from Mobile, Alabama, bound for Trinidad under a government bill of lading on the ship S.S. Gunvor. On her first day out, she was torpedoed by enemy submarine and the ship and cargo were a total loss. In spite of the carrier's failure to deliver the shipment, the bill of lading was surrendered to it and its claim for freight on the lost cargo was paid by the War Department. On audit, however, the Comptroller General disallowed the payment on the ground that the freight had not been earned and the sum was offset against other claims admittedly owing to the carrier. In that case, the government bill of lading provided in part as follows:

" 'Unless otherwise specifically provided or otherwise stated hereon, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier.' "

The shipper's bill of lading in part provided that—

" * * * 'Full freight to destination * * * and all advance charges against the Goods are due and payable * * * as soon as the Goods are received for purposes of transportation * * * Goods or Vessel lost or not lost.' * * * "

Under the "Conditions" of the government bill of lading appears the following:

" '1. Prepayment of charges shall in no case be demanded by carrier, nor shall collection be made from consignee. On presentation to the office indicated on the face hereof of this bill of lading, properly accomplished, attached to freight voucher prepared on the authorized Government form, payment will be made * * *.' "

Under the "Instructions" on the government bill of lading appears the following:

"2. * * * The consignee on receipt of the shipment will sign the consignee's certificate on the original bill of lading and surrender the bill of lading to the last carrier. The bill of lading then becomes the evidence upon which settlement for the service will be made."

Condition No. 1 of the government bill of lading conditions payment upon submission of the authorized government form voucher, and Instruction No. 6 of the voucher reads:

"Payment for transportation charge will be made only for the quantity of stores delivered at destination * * *."

The Court held that the carrier was not entitled to payment, because the provisions in the carrier's bill of lading gave way to the language in the government's bill of lading and the government's voucher conditioning payment upon the delivery of the cargo at destination.

■ The carrier in this case does not contend that it was entitled to prepayment of freight or that it is relying on the "goods or vessel lost or not lost" provision of its bill of lading. It is relying

in part upon the contention that where a carrier has by the act of the shipper been prevented from completing the voyage, the carrier is entitled to its full freight. This is a well-recognized rule of maritime law and is set forth in textbooks as follows:

In Robinson on Admiralty, page 854, it is said,

"The carrier's right to his freight ordinarily arises only by his having carried the cargo to destination. He is entitled to earn it by carrying the goods through, and cannot be asked to take less than full freight if the cargo owner asks delivery short of destination."

In Carver's Carriage of Goods by Sea (9th Edition) at page 815, it is said,

"Full freight payable. If the shipowner has been prevented from completing the voyage by an act or default of the charterer or cargo owner, he will be entitled to the full freight, although by the contract completion of the voyage and delivery at the destination were conditions precedent."

■ The plaintiff in this case concedes that this is the rule as between private parties, but contends that in this case the government acted in its sovereign capacity, and that therefore the rule is not applicable. The government cites Horowitz v. U. S., 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, as follows:

"It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. Deming v. United States, 1 Ct.Cl. 190, 191; Jones v. United States, 1 Ct.Cl. 383, 384; Wilson v. United States, 11 Ct.Cl. 513, 520. In the Jones case [1 Ct.Cl. 383], the court said: 'The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the Unit-

ed States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, *so long as they be public and general,* cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * In this court the United States appears simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.'" 267 U.S. at page 461, 45 S.Ct. 344. [Emphasis added.]

However, the defendant contends that under the rule of the Horowitz case the act of the government in order to be a sovereign act must be as therein declared "public and general", and that in this case the act of the Navy in ordering the Marmex to discharge her cargo at Alameda was not "public and general".

There is nowhere among the stipulated facts any statement that the orders of the Navy as to the Marmex unloading its cargo at Alameda applied to any other ship or any other cargo. The record is bare of any evidence that the order of the Navy was public and general. No evidence was introduced that any other ship was prevented from sailing or that other cargoes were similarly unloaded. In fact, the evidence that this very ship, the Marmex, proceeded with Navy cargo to Fiji in February, 1942, definitely indicates to the contrary. Apparently the Navy decided the Marmex did not have enough speed to deliver the particular cargo it wanted to send to Samoa, although it did have enough speed to carry a different cargo to Fiji some six weeks later.

I cannot feel that it has been established by the plaintiff that the act of the Navy in ordering the unloading of the cargo at Alameda was a sovereign act within the rule of the Horowitz case, supra.

The defendant further contends that the payment of the full freight here was not unlawful, because it was made pursuant to a specific contract between the Navy and the defendant, after the vessel had been loaded, calling for the delivery of the cargo to Alameda and the payment of an agreed amount to the defendant therefor.

It is recited in the written stipulation of the parties:

"XI. That the action of the United States Navy in ordering the S.S. Marmex to discharge the subject cargo at Alameda rather than permitting the voyage to Samoa was taken because of the speed of the Marmex.

"XII. That pursuant to said orders the S.S. Marmex did proceed to Encinal Terminal where it agreed to and did discharge and deliver said cargo free of lien to a representative of the United States Navy in consideration for the accomplishment of the Bills of Lading. It was contemplated by American Trading Company of San Francisco and the representatives of the United States Navy that accomplishment of the Bills of Lading would entitle American Trading Company of San Francisco to the agreed freight for the subject cargo from San Francisco to Pago Pago, Samoa."

It is admitted by the plaintiff that such an agreement was made, but the government contends that there was no consideration for such an agreement and that the Navy officer was not authorized to make the agreement or to authorize payment.

██ Admittedly, the defendant could not have asserted a legally valid lien on the cargo, under the holding in Prudential Steamship Co. v. U. S., 2 Cir., 1955, 220 F.2d 655, and in foregoing the lien, actually gave up nothing.

However, the general rule is that a promise to forbear, or the forbearance of, an invalid claim, honestly and reasonably believing it to be valid, is sufficient consideration. Restatement, Contracts §§ 76(b), 84(b) (1932). There is no suggestion here that the defendant had other than a good faith belief in the validity of this asserted lien, and it should be noted that the Prudential case was decided several years after this agreement was made. Furthermore, if the defendant gave up its valid claim in personam against the United States, there clearly is consideration; and when they signed the public vouchers, the defendant certified that the account was "correct and just", and therefore they can be said to have given up their claim in personam, even though the only designation used was a "lien". See 74 A.L.R. 301. Also, the defendant obligated itself to do something else which they were not obligated to do under the original contract by agreeing to discharge the cargo at Alameda instead of Samoa, and this was a legal detriment which clearly can suffice for consideration. Restatement, Contracts § 84(c). Furthermore, they clearly gave up whatever possibility there was of making a profit by carrying a cargo on the return trip from Samoa. Hence, it would appear that there was sufficient consideration for a binding contract, and if this is so, no inquiry need be made of the exact adequacy of the consideration. Restatement, Contracts § 81.

■ As to the authority of the agent of the Navy, the plaintiff contends that an agent of the United States has only the authority expressly granted to him, and that the agent here did not have express authority to agree to pay freight not lawfully due, citing Federal Crop Insurance Corporation v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10. No evidence of any kind has been offered as to the authority granted to the agent involved here. Neither is there any sug-gestion that the Navy officer who made the original contract was without authority to do so. And since we have concluded that there was sufficient consideration for making the second contract, it would appear that there is no more basis in the facts of this case for concluding that the Navy officer who made that contract had any less authority than the Navy officer who made the original contract.

■ The third contention made for the unlawfulness of the payment rests on the provisions of Title 31 U.S.C.A. § 529 set out below.[1] But no case has been cited holding payments unlawful by virtue of that statute, and the Supreme Court in the Alcoa case expressly reserved ruling on this point, noting that "The Government interprets a further provision of this statute that ' * * * payment shall not exceed the value of the service rendered * * *' to resolve the issue at bar in its favor. Like the court below, we find it unnecessary to pass upon this contention." 338 U.S. 421, at page 425, footnote 6, 70 S.Ct. at page 192. Nor has any case been cited which construes the language of that statute and resolves the questions that may properly be raised as to its application; e. g., Value to whom? Measured when, by what standard, and by whom? No evidence has been offered in the case at bar to show the value of the cargo, or the value to the plaintiff in preventing the Marmex from carrying that cargo to Samoa, but rather having it carried on another ship of presumably greater speed. Paragraph XI of the stipulation of facts set out above discloses that the action was taken because of the speed of the Marmex, and it would appear that the plaintiff did receive some value from this action. And it further appears that someone acting for the plaintiff thought at the time and under the circumstances that it was worth the full freight. Moreover, the services rendered included the giving up of the possibility of

1. " * * * in all cases of contracts for the performance of any service * * * for the use of the United States, pay-ment shall not exceed the value of the service rendered * * *." 31 U.S.C.A. § 529.

earning a profit on the return voyage. Under all the facts presented here, this Court is not constrained to hold the payment unlawful solely by reason of this statute.

For the foregoing reasons, it is the opinion of this Court that the disputed payment of $39,706.63 to the defendant was not improper or unlawful or an overcharge, and therefore the plaintiff is not entitled to recover this payment.

As regards two other payments by the plaintiff to the defendant, the parties have stipulated that there was no overcharge in respect to payment for the cargo consigned to Manila, P. I., and that there was an overcharge of $6,643.16 in respect to the cargo consigned to Corinto, Nicaragua.

Accordingly, judgment will be entered in favor of plaintiff and against defendant only for the amount of $6,643.16. Defendants to prepare findings of fact, conclusions of law and judgment.