75 F.3d 1535
 AMERICAN AIRLINES, INC., Alaska Airlines, Inc., Continental
Airlines Corporation, Inc., Delta Airlines, Inc., Eastern
Airlines, Inc., Northwest Airlines, Pan American World
Airways, Inc., United Airlines, and USAir, Inc., Plaintiffs-Appellants,
v.
Richard G. AUSTIN, Administrator, General Services
Administration, General Services Administration
and the United States, Defendants-Appellees.
 No. 95-1218.
 United States Court of Appeals,
Federal Circuit.
 Jan. 24, 1996.
 
 L. Dale Owens, Booth, Wade & Campbell, Atlanta, Georgia, argued for plaintiffs-appellants. With him on the brief were Gordon Dean Booth, Jr. and Steven W. Hardy. Of counsel was Scott A. Wharton.
 Freddi Lipstein, Attorney, Department of Justice, Washington, D.C., argued for defendants-appellees. With him on the brief were Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney and Douglas B. Jordan, Attorney. Of counsel was William Kanter.
 Before MAYER, Circuit Judge, SKELTON, Senior Circuit Judge, and BRYSON, Circuit Judge.
 Opinion for the court filed by Circuit Judge MAYER. Dissenting opinion filed by Circuit Judge BRYSON.
 MAYER, Circuit Judge.
 
 
 1
 The airlines appeal the judgment and order of the United States District Court for the District of Columbia holding that government transportation regulations, not the conditions and terms on airline tickets, govern unused ticket refund procedures. American Airlines, Inc. v. Austin, 826 F.Supp. 553 (D.D.C.1993). We affirm.
 
 Background
 
 2
 The essential facts are not in dispute. In September 1989, the General Services Administration (GSA) sent the airlines written demands to refund approximately $2.5 million for airline tickets the government allegedly purchased, but did not use, between January 8, 1985, and September 7, 1989. In response, the airlines requested that GSA produce the unused tickets, which it was unable to do. GSA explained that its refund demands were based on estimates of the government's unused tickets during the cited period. The estimates, in turn, were based on a statistical model extrapolated from a survey of unused tickets issued to the Army and the Air Force over a one-year period.
 
 
 3
 The airlines requested that GSA reconsider its demands, and GSA subsequently limited its claims to refunds for tickets purchased by the Army and the Air Force between January 8, 1985, and January 7, 1986. The total amount GSA sought to have refunded for this period was $333,782. However, GSA was able to produce only a fraction of the actual tickets for which it was seeking refunds. The airlines then denied GSA's refund demands, prompting GSA to offset more than $300,000 in payments due to the airlines from the federal government.[1]
 
 
 4
 On June 14, 1990, the airlines filed suit in the United States District Court for the District of Columbia seeking to recover the offset amounts. The airlines alleged, inter alia: (1) that the refund demands violated federal transportation regulations because GSA had not returned each ticket for which it was seeking a refund (Count I); (2) that GSA had violated the Debt Collection Act of 1982, by not giving the airlines an opportunity to inspect and copy GSA's records (Count III); and (3) that GSA was not entitled to refunds because it had not sought them within the time limits imposed by the terms of the tickets themselves (Count IV).[2]
 
 
 5
 Both parties moved for summary judgment. On July 15, 1993, the court granted summary judgment for the airlines on Count I, and dismissed Count III as moot. See 826 F.Supp. at 557. GSA does not appeal either of these rulings.[3]
 
 
 6
 With respect to Count IV, the court granted summary judgment in GSA's favor. Id. Specifically, it held that the airlines issue tickets to the government in exchange for Government Transportation Requests (GTRs), which state and incorporate the terms of federal transportation regulations governing refunds. Based on the airlines' acceptance of the GTRs, the facts of this case, and the law, the court held that "both the airlines and the government were bound not by the contract terms on the tickets, but by the applicable federal regulations." Id. This appeal by the airlines followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(2).
 
 
 7
 The airlines concede that all mandatory regulations are incorporated into air transportation contracts with the government. They contend, however, that where there is no conflict between regulations and the particular terms of a contract, the contract's terms apply and coexist with the regulations. Because the transportation regulations do not prohibit, and are not in conflict with, the airlines' ticket and tariff terms imposing time limits for refund requests, the airlines argue that such time limits are part of the contracts with the government. Since GSA did not seek the refunds at issue until after the expiration of these time limits,[4] the airlines conclude that GSA is not entitled to them.[5]
 
 Discussion
 
 8
 The difficulty in this case resides in the peculiar manner in which the government procures air transportation for its employees. There is no master contract between the government and the airlines setting forth the rights and obligations of the parties.[6] Generally, a government employee requiring air transportation submits a GTR to the airline. 41 C.F.R. § 101-41.203-1 (1994). The GTR sets forth seven "conditions" under which the transportation is being acquired, the first of which states: "This transportation request incorporates the regulations published in Title 41, Part 101-41 of the [CFR]." In exchange for the GTR, the airline generally provides the government traveler the desired ticket. See id. § 101-41.207-1, -41.401(d)(2). The regulations become part of the agreement between the airlines and the government by virtue of the airlines' acceptance of the GTRs, explicitly incorporating the regulations into the request by reference. See 826 F.Supp. at 557; Smithson v. United States, 847 F.2d 791, 794 (Fed.Cir.1988). The regulations address refunds for unused tickets but do not explicitly limit the government's right to such refunds except that any recovery by offset must be made within ten years. 41 C.F.R. § 101-41.209, -41.210,-41.504. However, the tickets, which are no different from those sold to the public, generally contain time limits within which passengers must seek refunds for unused tickets.
 
 
 9
 Thus, the issue before us is whether the government is entitled to refunds for tickets that it did not use, in spite of provisions on the tickets, ticket inserts, and tariffs incorporated into the tickets by reference, limiting the time for seeking such recovery. This is a question of law, which we review de novo. See Smith v. Brown, 35 F.3d 1516, 1517 (Fed.Cir.1994).
 
 
 10
 Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void. See, e.g., Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1150-53 (Fed.Cir.1983) (price adjustment clauses violating federal statute were invalid); Yosemite Park v. United States, 217 Ct.Cl. 360, 582 F.2d 552, 560 (1978) (provision violating federal procurement law is an "invalid, unenforceable provision of the Agreement"). We therefore must decide whether the refund time limits imposed by the airlines violate, or conflict with, any statutory right of the government. If so, the limits cannot bar the government from recovering refunds for unused airline tickets. Consequently, we must construe the statutes according to the traditional tools of statutory construction. We begin with an analysis of their language. See Greyhound Corp. v. Mt. Hood Stages, Inc., 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978).
 
 
 11
 Generally, the government is statutorily prohibited from making advance payments to its contractors. Specifically, "a payment under a contract to provide a service ... for the United States Government may not be more than the value of the service already provided." 31 U.S.C. § 3324(a) (1988). This prohibition first became law in 1823, and has remained in effect in some form since then. See S.Rep. No. 1026, 92d Cong., 2d Sess. 3 (1972). However, an advance payment may be made to a contractor if it is authorized by a specific law. 31 U.S.C. § 3324(b)(1) (1988). Such a law exists for the government's procurement of passenger transportation services. The Transportation Payment Act of 1972 (TPA), as amended, provides:
 
 
 12
 Under regulations the head of an agency prescribes that conform with standards the Secretary of the Treasury and the Comptroller General prescribe jointly, a bill under this section may be paid before the transportation is completed notwithstanding section 3324 of this title when a carrier or freight forwarder issues the usual document for the transportation. Payment for transportation ordered but not provided may be recovered by deduction or other means.
 
 
 13
 31 U.S.C. § 3726(f) (1988) (emphasis added) (originally codified at 49 U.S.C. § 66(b)).
 
 
 14
 The language of section 3726(f) shows that Congress intended for the government to recoup any advance payments made for transportation it does not receive. It is equally clear that Congress granted the government the right to make such recoupment by deduction or other means. Furthermore, it placed no time or other limitation on the government's recovery right. Its intention that no such limitation or condition be placed on this right is revealed further in the textual context of section 3726(f).
 
 
 15
 It is axiomatic that "individual sections of a single statute should be construed together." Erlenbaugh v. United States, 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972). We must analyze a particular provision in connection with the whole statute "and the objects and policy of the law, as indicated by its various provisions, and give it such construction as will carry into execution the will of the legislature." Kokoszka v. Belford, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974); Smith, 35 F.3d at 1523. In construing section 3726 as a whole, it is apparent that Congress did not intend to limit the government's ability to recover unused airline ticket refunds.
 
 
 16
 Specifically, if the government determines, after audit, that it paid a carrier more than the rate allowed under applicable tariffs, the government may deduct such amount from a bill subsequently due the carrier. 31 U.S.C. § 3726(b) (1988); see also Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 793 (Fed.Cir.1993). However, the government must deduct such amount within "3 years ... after the time a bill is paid." 31 U.S.C. § 3726(b) (emphasis added). Similarly, a carrier may file a claim with the government for money owed to it, but it must also do so within 3 years of accrual. Id. § 3726(a); see also Dalton v. Sherwood Van Lines, 50 F.3d 1014, 1016 (Fed.Cir.1995).
 
 
 17
 In contrast to the time limits imposed on both the government and carriers for seeking the recovery of money allegedly owed them under section 3726(a) and (b), Congress placed no such limitations on the government's right to recover advance payments made to carriers for unused transportation. 31 U.S.C. § 3726(f). Its passivity in this regard is revealing. "In the context of the statute's precisely drawn provisions, this omission provides persuasive evidence that Congress deliberately intended" no such limitation to apply. United States v. Erika, Inc., 456 U.S. 201, 208, 102 S.Ct. 1650, 1654, 72 L.Ed.2d 12 (1982);[7] Smith, 35 F.3d at 1524.
 
 
 18
 Consequently, we conclude that Congress' inclusion of time limitations on the government's right to recover overcharges under section 3726(b) and the carriers' right to file claims under section 3726(a), coupled with its exclusion of such limits on the government's right to recover advance payments for unused tickets under section 3726(f), manifests its intention to exclude any limitations on the latter. This intention becomes even clearer upon review of the legislative history of the TPA and the act it amended.
 
 
 19
 The TPA amended section 322 of the Transportation Act of 1940, ch. 722, 54 Stat. 955 (the "1940 Act"). See Pub.L. No. 92-550, § (b), 86 Stat. 1163, 1164 (codified, as amended, at 31 U.S.C. § 3726). Section 322, which was enacted in direct response to carriers' complaints about inordinate delays in receiving payment from the government, authorized the payment of bills for the transportation of freight or passengers on behalf of the United States upon their presentation and before audit. See generally, United States v. New York, New Haven & Hartford R.R., 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957). While waiving the prohibition against payment to contractors prior to audit, the 1940 Act reserved to the government the right to deduct any overcharges from amounts subsequently due the overpaid carrier. Id.
 
 
 20
 As the Court explained in New York, New Haven, prior to enactment of the 1940 Act, "the Government protected itself against transportation overcharges by not paying transportation bills until the responsible government officers, and, in doubtful cases, the General Accounting Office, first audited the bills and found that the charges were correct." Id. at 255, 78 S.Ct. at 214. The 1940 Act replaced this means of protecting against overcharges with the statutory right to collect them from subsequent bills. Id. at 257, 78 S.Ct. at 215. The right to deduct overcharges from subsequent bills of the carrier was deemed necessary to protect the government since bills would have to be paid when presented and prior to audit. United States v. Western Pac. R.R., 352 U.S. 59, 74, 77 S.Ct. 161, 170, 1 L.Ed.2d 126 (1956).
 
 
 21
 "Congress was desirous of aiding the [transportation carriers] to secure prompt payment of their charges, but it is also clear that ... the Government's protection against overcharges available under the preaudit practice should not be diminished." 355 U.S. at 260, 78 S.Ct. at 216 (footnote omitted). Thus, "the Government's statutory right of setoff was designed to be the substantial equivalent of its previous right to withhold payment altogether until the carrier established the correctness of its charges." Id. at 261, 78 S.Ct. at 217. Importantly, the government's setoff right was not limited or qualified by time. See S.Rep. No. 334, 85th Cong., 2d Sess. (1957), reprinted in 1958 U.S.C.C.A.N. 3923, 3927; see also Strickland Transp. v. United States, 334 F.2d 172, 180 (5th Cir.1964).
 
 
 22
 In 1958, however, Congress determined that "a reasonable time limitation should be established for such deductions." S.Rep. No. 334, reprinted in 1958 U.S.C.C.A.N. at 3927. It therefore amended section 322 to expressly limit the government's right to deduct overcharges to a period of three years after the payment of the original bill. Act of Aug. 26, 1958, Pub.L. No. 85-762, § 2, 72 Stat. 860 (codified, as amended, at 31 U.S.C. § 3726(b)). By this act, Congress also added the three-year limitation on contractor claims against the government. Id. (codified, as amended, at 31 U.S.C. § 3726(a)).
 
 
 23
 Notwithstanding the enactment of the 1958 amendment, the transportation industry remained dissatisfied with the government's payment procedures. Indeed, Congress stated in 1972 that "[o]ver the years the carrier industry has frequently complained about the Government's billing requirements and consequent delays in payment for freight and passenger transportation services furnished the United States." S.Rep. No. 1026, 92d Cong., 2d Sess. 2-3 (1972); see also H.R.Rep. No. 1472, 92d Cong., 2d Sess. 3 (1972), reprinted in 1972 U.S.C.C.A.N. 4482, 4484.
 
 
 24
 In 1972, Congress responded to industry's dissatisfaction. Almost the exact quid pro quo found in the 1940 Act--the right to pre-audit payment in exchange for post-audit offset recovery of overcharges--is at the heart of the TPA. However, as discussed below, Congress did not limit the government's offset right under the TPA, as it did the rights in the 1940 Act by the 1958 Amendment.
 
 
 25
 By the TPA, Congress again amended section 322 to allow for advance payments to transportation carriers, subject to certain safeguards. Congress' purpose in enacting the TPA was to permit payment for the transportation of persons or property for or on behalf of the United States in advance of completion of the transportation services, "subject to later recovery by deduction or otherwise of any payments made for any services not received as ordered." S.Rep. No. 1026 at 2 (1972); see also H.R.Rep. No. 1472 at 1-2, reprinted in 1972 U.S.C.C.A.N. at 4482-83 (comments of the Comptroller General on the TPA). Therefore, while Congress waived the prohibition against advance payments, it reserved to the government the right to recover any such payments for services it did not use by deduction or other means. This right was intended to be the functional equivalent of its prior right to refrain from payment altogether until after the service had been provided, just as the right to recover overcharges in the 1940 Act was intended to replace the government's previous right to withhold payment until after audit. Cf. 355 U.S. at 261, 78 S.Ct. at 217. Moreover, Congress, fully aware of the limitations it had placed on the government's and contractors' rights to recover on certain claims in the 1958 amendment, imposed no similar limitations on the government's right to recover advance payments for unused services. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (it is generally presumed that Congress is knowledgeable about existing laws pertinent to later-enacted legislation).
 
 
 26
 The six-year statute of limitations on government actions for money damages founded on contracts existed at the time the TPA was enacted, but that was the only limitation on the government's right of recovery. However, that provision did not necessarily apply to administrative deductions or offsets, only actions or suits. See 28 U.S.C. § 2415(i) (1988); S.Rep. No. 378, 97th Cong., 2d Sess. 16 (1982), reprinted in 1982 U.S.C.C.A.N. 3377, 3392 (section 9 of the Debt Collection Act of 1982, 28 U.S.C. § 2415(i), "clarifies" that the government may utilize administrative offsets beyond the six-year statute of limitations). It was not until 1982 that Congress limited the government's right of administrative offset to ten years. See Debt Collection Act of 1982, Pub.L. No. 97-365, § 10, 96 Stat. 1749, 1754 (codified at 31 U.S.C. § 3716(c)(1) (1988)). Aside from these two limitations, however, Congress did not directly limit the government's right of offset under the TPA.
 
 
 27
 Indeed, the right to receive such advance payments was considered by both the government and industry to be a "privilege," the abuse of which would be safeguarded, in part, by the government's right of offset. See S.Rep. No. 1026 at 4; Transportation Charges of Federal Government Shipments: Hearing on H.R. 15054, H.R. 14723, H.R. 14770, and S. 3240 Before the Subcomm. on Transportation and Aeronautics of the House Comm. on Interstate and Foreign Commerce, 92d Cong., 2d Sess. 8-9 (1972) [hereinafter Hearing] (statement of Deputy Assistant Administrator of GSA), 23 (statement of Vice President and General Counsel of the Transportation Association of America). Moreover, Congress contemplated that "no new or additional expenditures of the U.S. Government funds [sic]" should be incurred as a result of the TPA's enactment; rather, "substantial reductions in Government expenditures are expected to be achieved." H.R.Rep. No. 1472 at 2, reprinted in 1972 U.S.C.C.A.N. at 4483.
 
 
 28
 Congress envisioned that the government would protect itself against payments for unused services through the right of setoff granted in the TPA. GAO's Associate General Counsel testified before Congress that the government constantly does business with the same carriers; thus, the GAO "would set off any overcharges that might be paid to these carriers because of the lack of service which they had certified to. If they didn't furnish the service and they collected the charges, knowingly or unknowingly, we still have the setoff weapon." Hearing at 20. Congress expressly contemplated that the use of administrative offsets would ensure that the government does not pay for services it does not receive.
 
 
 29
 As the Supreme Court has held, it is " 'the duty of all courts to observe the conditions defined by Congress for charging the public treasury.' " Schweiker v. Hansen, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (quoting Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)). One such condition on charging the public treasury when a charge is in advance of receiving transportation services is the government's right to recover payments when it does not use the services, as set forth in section 3726(f). The airlines' ticket provisions limiting such recovery are plainly inconsistent with the rights Congress granted the government and are no bar to the government's right to refunds.[8] This is especially true where, as here, federal transportation regulations, implementing congressional policy, were part of the agreements with the airlines.
 
 
 30
 The transportation regulations require that agencies demand refunds for unused airline tickets. 41 C.F.R. § 101-41.210-2 (1994). In turn, carriers are required to promptly make the refunds,[9] and if they fail to do so, the government must take action to recover, using administrative offsets if necessary. Id. § 101-41.210-3a, -41.210-5(b). If a carrier has a claim pending, the government will deduct the refund amount from that claim. Id. § 101-41.504(a). Otherwise, the government will deduct the amount due from an unpaid carrier's bill, constrained only by the ten-year limitation. Id. § 101-41.504(b). Notably, the distinction between the three-year limitation on the government's right to offset overcharges and the ten-year limit on the government's right to offset advance payments for unused services is explicit. Id. This ten-year offset limitation was not explicitly set out in regulations until December 1985, during the period in question. See Administrative Offset and Interest Assessment on Transportation Related Claims, 50 Fed.Reg. 49,848 (1985) (codified at 41 C.F.R. § 101-41.504(b)) (effective Dec. 5, 1985). But, it was enacted by Congress in 1982, so there is no question about its application in the interim.
 
 
 31
 Notwithstanding the statutory and regulatory requirements we have discussed, the airlines argue that the ten-year limitation only applies to offsets against refunds that are valid, and they do not think the government's claims are valid. Their primary rationale for this argument is that the government exceeded the shorter time limit imposed by the airlines. The airlines do not argue that the government is not otherwise entitled to the refunds. They do not contend that the government did not buy the tickets. Nor do they claim that the government actually used the tickets. Rather, they rest on the provisions on tickets, or tariffs incorporated by reference, limiting the time in which a passenger may recover refunds. However, those terms are inconsistent with the government's right to recover unused airline tickets set forth in the TPA.
 
 
 32
 Relying on Missouri, Kansas & Texas Railway Co. v. Harriman, 227 U.S. 657, 33 S.Ct. 397, 57 L.Ed. 690 (1913), the airlines also argue that the existence of a "general statute of limitations," does not preclude the enforceability of "specific contractual provisions shortening" the limitation period. There, the Supreme Court addressed the issue of whether a provision in a livestock transportation contract between private parties, which required any suit for loss or damage to be brought within 90 days of occurrence, was void, in light of a federal statute stating that no contract shall exempt a common carrier from liability for loss or damage. The Court held that the parties may limit or qualify liability by special contract, provided the limitation is just and reasonable, as it found the 90-day clause to be. The contract provision in question did not conflict with or abridge a statutory right of the government, granted in return for industry's privilege of receiving advance payments. Instead, that provision was explicitly included in a special contract for a lower fare than published tariff rates, in return for which the shipper had a shorter period within which to file suit for damages. The shipper thus chose to enter that contract and be bound by the shorter filing period in exchange for a lower fare. In contrast, here, the federal regulations implementing the policies of the TPA were part of the parties' agreements and conflict with the airlines' unilaterally imposed time limitations.
 
 Conclusion
 
 33
 Accordingly, the judgment and order of the United States District Court for the District of Columbia are affirmed.
 
 
 34
 AFFIRMED.
 
 
 35
 BRYSON, Circuit Judge, dissenting.
 
 
 36
 I respectfully dissent.
 
 
 37
 By purchasing airline tickets, the government entered into contracts with the airlines, the terms of which were reflected in the airlines' tariffs and on the face of the tickets. The terms were simple: the government paid for the tickets in advance and obtained the right to travel at the designated time. If the government did not use the tickets, it could obtain a refund by complying with the contract terms governing refund applications.
 
 
 38
 The airlines performed their part of the bargain. The government, however, wants to renege. Its position is that it was not bound to comply with the refund provisions of its contracts with the airlines because the pertinent statutes and regulations render those provisions unenforceable. I find that argument unconvincing.
 
 
 39
 It is true that the pertinent statutes and regulations are deemed to be part of the contracts between the government and the airlines, and that in the event of any conflict between the ticket provisions and the applicable statutes and regulations, the statutes and regulations prevail. As I read the statutes and regulations at issue in this case, however, they do not conflict with the terms of the parties' agreements regarding refunds for unused tickets. I would therefore hold those terms fully enforceable against the government and would therefore reverse the order of the district court granting partial summary judgment for the government.
 
 
 40
 * The statute on which the government principally relies is 31 U.S.C. § 3726(f). That statute authorizes agencies to pay for transportation services in advance and states that payments for "transportation ordered but not provided may be recovered by deduction or other means." The government argues that the statutory authorization to use the administrative offset mechanism to collect amounts due for transportation "ordered but not provided" overrides contractual provisions requiring ticketholders to seek refunds for unused tickets within a designated period of time. But a statutory provision permitting the government to use a particular mechanism to collect its debts does not foreclose contracting parties from defining the terms under which those debts will arise. I therefore cannot subscribe to the necessary implication of the government's argument that section 3726(f) wipes out all restrictions, of whatever character, governing refunds for unused tickets.
 
 
 41
 To be sure, the government does not press its argument that far, but as a result its argument is internally inconsistent. The government concedes that when it purchases "no-refund" tickets and does not use them, it may not recover a refund for the unused transportation services. But if a trip not taken constitutes "transportation ordered but not provided," as the government contends in the context of this case, I cannot fathom why the same analysis would not equally apply to permit the government to recover a full refund on "no-refund" tickets. The government's unwillingness to carry its statutory argument to its logical conclusion reveals the flaw in the government's analysis of the statutory issue.
 
 B
 
 42
 The court expands upon the government's statutory argument with the following analysis: (1) prior to the enactment of section 3726(f), the government was barred by the predecessor to 31 U.S.C. § 3324(a) from paying for services it had not received; (2) section 3726(f) was enacted to allow the government to prepay transportation charges, but it was not intended to give transportation contractors greater rights than they enjoyed under the prior, no-prepayment regime; (3) an unused ticket represents services paid for but not received; therefore, (4) section 3726(f) bars the airlines from denying the government's refund claims for unused tickets, even if the claims are made outside the agreed-upon refund periods.
 
 
 43
 This analysis, however, suffers from the same flaw that afflicts the government's argument: It requires the court to conclude that section 3324(a) prohibits the government from ever paying for airline tickets that are not used. Thus, for example, if a no-refund ticket that is not used represents a transportation service that is not "received," the government may not pay for such a ticket. The court's interpretation of section 3324(a) would also appear to prohibit a contractor from enforcing any contractual limitations on the government's right to collect a refund for an unused ticket, no matter how reasonable those limitations might be and no matter what concessions the contractor may have made to obtain them.
 
 
 44
 Indeed, the rationale of the court's statutory analysis would appear to conflict with the government's own regulations. For example, the regulations require that the government present the unused ticket to the carrier to obtain a refund. 41 C.F.R. § 101-41.210-3. If section 3726(f) prohibited the government from ever paying for unused transportation services, then presumably the government could not assent to, and the airlines could not insist on, that form of proof that a particular ticket was purchased and not used. I am confident that the court does not mean to go that far, but that would appear to be the logical consequence of its rationale.
 
 
 45
 The better view of both section 3324(a) and section 3726(f) is that when the government purchases an airline ticket, it receives value in the form of the right to travel to a designated place at a designated time and the right to obtain a refund if the government does not use the ticket but satisfies the refund provision of the contract. See United States v. American Trading Co., 138 F.Supp. 536 (N.D.Cal.1956) (section 529, a predecessor to section 3324(a), does not specify the meaning of "value," and does not prohibit the government from making full payment for a transportation service that the government contracted for but decided not to use). Thus, it is permissible for the government to pay, either beforehand or afterwards, for a ticket that is not used and is not redeemed within the contractual period. Section 3726(f) was intended to permit the government to recoup "improper or erroneous payments," see S.Rep. No. 1026, 92d Cong., 2d Sess. 4 (1972); it should not be read to compel a contractor to surrender its rights under a contract to which the government assented.
 
 C
 
 46
 The transportation regulations, on which the government places heavy reliance, lend no support to the government's position. Instead, the regulations are consistent with the ticket provisions governing refunds for unused tickets. The regulations require air carriers promptly to process government applications for unused ticket refunds. 41 C.F.R. § 101-41.210-3a. The regulations do not, however, provide that such refunds must be paid regardless of whether the government has complied with the contractual terms governing those refund applications. In fact, the regulations suggest the contrary, as they provide that a carrier that declines to make a refund must supply an explanation for its action, see id.; one perfectly satisfactory explanation for the carrier's refusal to pay a refund is that the government's right to a refund under the terms of the transportation contract (as evinced by the carrier's tariff and the face of the ticket) has expired.
 
 
 47
 There is likewise no force to the government's contention that the transportation regulations give it at least ten years to file a refund claim, regardless of the terms of the airlines' tickets and tariffs. The government relies on the regulation that provides that when the government presses a claim against a carrier, it has a ten-year period during which it may use an administrative offset to recover an ordinary debt. 41 C.F.R. § 101-41.504(b). That regulation, the government argues, overrides the contractual provisions in the airlines' tickets and tariffs that govern the filing of refund claims. But the government's argument overlooks the general principle that contract terms limiting the time for bringing a claim under the contract bind the parties regardless of the more generous provisions of a general statute of limitations. See Missouri, Kansas & Texas Ry. Co. v. Harriman Bros., 227 U.S. 657, 672, 33 S.Ct. 397, 401, 57 L.Ed. 690 (1913); United States v. Republic Ins. Co., 775 F.2d 156, 158-59 (6th Cir.1985); United States v. Chicago, R.I. & P.R. Co., 200 F.2d 263, 264 (5th Cir.1952); United States v. Seaboard Air Line Ry. Co., 22 F.2d 113, 115 (4th Cir.1927). See also Do-Well Machine Shop, Inc. v. United States, 870 F.2d 637, 640-41 (Fed.Cir.1989) (contractual one-year limitation on submitting claims is enforceable even though the Contract Disputes Act contained no limitations period governing the submission of claims).
 
 
 48
 The ten-year period set forth in the regulations at 41 C.F.R. § 101-41.504(b) (and in the cognate statute, 31 U.S.C. § 3716), is merely the period in which the government is permitted to assert, via the offset procedure, what it believes is a valid debt. After the expiration of the contractual period for refund applications, however, there is no valid debt to collect, since the airline no longer has an obligation to pay a refund, just as it has no obligation to pay a refund if the government does not satisfy any other contractual terms governing refund applications that do not conflict with any statute or transportation regulation.
 
 
 49
 It is important to keep in mind that there is no principle of law that requires an airline company to permit any traveler to obtain a refund for a ticket that is not used. The airlines could treat travelers just like purchasers of football tickets--persons who have a right to attend a particular event but have no right to a refund if, for some reason, they do not attend. In most cases, the airlines have adopted a more generous approach by permitting refunds under particular circumstances. But the fact that the airlines have created qualified refund rights as part of their transportation contracts with the public does not mean that there is a presumptive right to a refund and that the airlines' restrictions on the refund claim process must be viewed with a jaundiced eye.
 
 
 50
 There are good reasons for the airlines to impose controls on their liability for unused ticket refunds, and the traveling public, including the government, presumably benefits from those restrictions in the form of lower fares than would be charged if the airlines offered refunds on an open-ended, unqualified basis. Moreover, the periods within which the refunds at issue in this case could be sought were quite reasonable--even generous. The seven plaintiff airlines with time limitations on refund applications required the claims to be filed within one to five years, with most of them permitting claims to be filed three years or more after the date of the ticketed travel. That much time should be ample for any individual or organization with even a semblance of an orderly accounting system to prepare and file refund claims. The government, however, has now effectively forced the airlines to provide it special treatment with regard to refunds, and to do so for free. Any restriction on freedom of contract should be viewed with skepticism; this one is particularly distasteful, as it has the effect of allowing the government, cost free, to force the airlines to bear the burden of the government's inefficiency. Absent far more compelling support in statute or regulation for this instance of governmental special pleading, I cannot endorse such a result.
 
 
 
 [1]
 GSA also claimed $25,471 from Eastern Airlines in its bankruptcy proceeding
 
 
 [2]
 The airlines' complaint contained two other counts that were later dismissed with the parties' consent
 
 
 [3]
 Consequently, GSA is not entitled to refunds for any allegedly unused tickets that it did not submit to the airlines. Only refunds for unused tickets actually presented to the airlines, amounting to approximately $41,000, remained at issue below and are at issue here
 
 
 [4]
 The time limits vary from 13 months to 5 years. It is undisputed that GSA failed to comply with all limits, except for United Airlines' five-year limit. Additionally, because American, Piedmont, and Eastern Airlines did not have any refund time limits, the government's right to refunds against them is also undisputed
 
 
 [5]
 The airlines also maintain that the court erred in finding as fact that the airlines had agreed that only the regulations, to the exclusion of the ticket terms, would apply. Because we decide this case as a matter of law, we need not address this issue
 
 
 [6]
 However, there are certain contracts that exist, such as "city-pair" contracts for use between designated cities. See 41 C.F.R. § 301-15.20-.28 (1994); Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 792 (Fed.Cir.1993). The parties do not distinguish between rights under contract air service and noncontract air service; thus, we make no such distinction
 
 
 [7]
 In 1986, Congress restructured the Medicare statute to provide for administrative review of Part B claims exceeding $500, and judicial review of those involving more than $1,000, effectively superseding the Court's holding. See Martin v. Shalala, 63 F.3d 497, 502-03 (7th Cir.1995)
 
 
 [8]
 Our holding is consistent with the Comptroller General's opinion on this issue. In Northwest Airlines, Inc., B-210600, Sept. 18, 1984, 1984 U.S. Comp.Gen. LEXIS 530, Northwest Airlines argued, in part, that GSA's setoff action for unused transportation services was improper because GSA had not met the three-year refund limitation set forth on its tariffs. The Comptroller General held that "Northwest's tariff [does not] have the effect of restricting the government's use of administrative setoff to recover refunds for unused airline tickets." Id
 
 
 [9]
 To the extent that the airlines argue that the government is obligated to pay for transportation services it orders even if it does not use them, we disagree. It is in direct conflict with this regulation, the validity of which the airlines do not challenge